**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES MCCRAY, III,** *Plaintiff,* | : | **CIVIL ACTION** |
| **v.** | : | |
| **SUGARHOUSE HSP GAMING, L.P. d/b/a RIVERS CASINO PHILADELPHIA,** *Defendant.* | : | **NO. 23-CV-01960** |

**MEMORANDUM**

**KENNEY, J.** **MAY 30, 2024**

## I. INTRODUCTION

Plaintiff Charles McCray, III ("McCray"), an African-American individual, was an employee at Defendant Sugarhouse HSP Gaming, L.P. d/b/a/ Rivers Casino Philadelphia ("the Casino"). He brings claims of race discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, the Civil Rights of 1866, and the Pennsylvania Human Relations Act ("PHRA"). The Casino has moved for summary judgment on all of McCray's claims (ECF No. 22). This motion is fully briefed and ripe for review.

## II. FACTUAL BACKGROUND

McCray began working at the Casino full-time as a Dual Rate Poker Supervisor in Fall 2021. ECF No. 21 ¶ 10. His job responsibilities included working both as a supervisor and dealer, depending on the need. ECF No. 25-5 ("McCray Dep.") at 78:12-17. Although he enjoyed his employment at first, he alleged that a series of incidents took place which were demeaning and/or limited his compensation. ECF No. 21 ¶¶ 12-16. McCray claims that "these actions were taken because of his race." *Id.* ¶ 17. McCray also asserts that after he made a series of complaints to his

employer about discriminatory treatment, he was terminated in retaliation for those complaints. ECF No. 25-2 at 10.

McCray's most prominent complaint is that he was repeatedly given fewer tables to deal than other employees, was put on cleaning duty and breaks more often, and was forced to take longer breaks than other employees, all of which resulted in him earning fewer tips than his peers. *Id.* at 3-6. McCray was not aware of any specific individuals who received more favorable treatment than he did, or their races. While discussing a particular incident in which he felt that he was not given as many tables as other dealers, he compared his tables to those of "two women" who were given more tables than he was, but "[did not] recall" their names or races. McCray Dep. at 90:12-94:4.

McCray testified that while working at tournaments, he could be stuck on a table for over an hour, while the other dealers in the room would be working at more tables, and thus able to make more money. ECF No. 25-2 at 5. McCray suggested that other dealers could work at seven or eight games, while he could only work at three. McCray Dep. at 97:12-97:17; *see also id.* at 103:6-20. He could not recall the identity of any of those other dealers, and stated that they were "all different races." *Id.* at 94:5-95:8; 97:12-98:5; *see also id.* at 103:6-20. McCray did not know the names or races of any of the employees that were purportedly able to deal more hands than he was. *Id.* at 97:12-98:5; *see also id. at* 103:6-20. McCray testified that he did not "ever look to compare [him]self to any of the white poker dealers, to see how many tables they were getting." *Id.* at 100:3-6. Evidence from the Casino's contemporaneous records show that on March 10-11, 2022, McCray dealt 29.45 hands per hour, above the average of 29.25 hands per hour. ECF No. 21-25. A lengthier analysis from February 25, 2022-March 11, 2022 shows McCray dealing 29.49

hands per hour, again above the average of 29.35. ECF No. 21-26.[1] A contemporaneous email referencing McCray's December 2021 complaint to Human Resources (HR) states that he worked a "pretty standard" number of games on the day in question. ECF No. 21, Ex. Q. at 2.

Along those lines, McCray generally alleged that other dealers would be scheduled to deal higher-value tournaments more frequently than he would, but he could not specifically identify any of those other dealers, by name or by race. McCray Dep. at 135:23-137:4. Similarly, McCray claimed that he would not be assigned as many players to his tables as other dealers, but he conceded that he could not even see how many players were at the other tables, due to his positioning in the room. *Id.* at 138:5-140:15. Additionally, McCray claimed that his supervisors (Mike Ricci and Alex Gomez) would regularly ignore him when he was dealing and needed his chips to be refilled. *Id.* at 115:23-118:5. McCray was not specifically aware of whether other dealers had similar issues. *Id.* at 118:15-119:22.

An incident took place where McCray called his supervisor (Alex Gomez) to say that he would be a few minutes late. *Id.* at 105:21-106:20. When McCray arrived, he was informed that he was out of the rotation for the day. *Id.* Gomez testified that if a dealer called ahead of time to say they would be late, they would not be assigned a table. *See* ECF No. 21, Ex. R at 20:8-20. McCray was not aware of a white poker dealer who had said he would arrive late, and then was permitted to work. McCray Dep. at 108:1-4. In fact, McCray was not aware of whether anyone who had called in to warn of lateness would have been permitted to work. *See id*. at 107:16-25 ("I'm sure people call in all the time just to give a heads up that" they might be late, because lateness "could mess up the whole string.").

[1] McCray responds in his brief that "[t]he alleged email claiming that Mr. McCray was given 'average' dealing time was a façade – the reports actually submitted do not show that Mr. McCray was actually given comparable or more or average dealing time compared to the total time spent at work." ECF No. 25-2 at 7. Yet McCray cites to no evidence rebutting Defendant's reports.

McCray also claims that he was pulled off his shift "more than 10 times" in order to complete various online training programs, *id.* at 108:24-109:2, although the evidence shows that after his orientation period in October 2021, McCray only completed a total of four trainings between November 2021 and his termination in June 2022. ECF No. 21, Ex. GG. McCray was not aware of any evidence that he was disproportionately given trainings (and prevented from earning money) because of his race. McCray Dep. at 111:3-10 ("Q. Do you have any facts or evidence to support your belief that Alex would pull you off of the floor to have you do the training programs because you are African American? . . . A. Besides them actually doing it, no.").

McCray claims that in addition to this financial mistreatment, his supervisors made repeated comments about his tip jar being full, which he interpreted as inappropriate. *Id.* at 111:19-114:8. McCray did not ask any other employees if his supervisor made similar comments to them. *Id.* at 114:25-115:3 ("Q. Did you ask any other poker dealers if Mike or Alex has made comments about how full their tip boxes were? A. No."). Similarly, McCray claims that an unnamed supervisor once purposefully asked a customer in a MAGA hat to sit at McCray's table during a tournament. ECF No. 21 ¶ 33. McCray was not aware of who specifically sent the man to his table, and stated that there were other tables with open seats as well. McCray Dep. at 124:4-9.

Another category of complaints raised by McCray involve the Casino's COVID-19 policies. He claims that he was discriminated against by having the COVID-19 policies applied to him more punitively than they were applied to similarly situated employees. ECF No. 25-2 at 4-5. McCray was furloughed in January 2022 because he did not have his COVID-19 vaccine. ECF No. 21 ¶¶ 19-20; McCray Dep. at 226:22-227:10. At the time, there was a city-wide mandate in Philadelphia requiring employees to be vaccinated in order to work in-person. ECF No. 21 ¶ 20.

McCray testified that given a choice between getting vaccinated and working, he wanted to "hold out for as long as possible" from getting the vaccine. McCray Dep. at 226:25-227:10.

Relatedly, McCray claims that he was unfairly put on leave in May 2022, with the Casino using its COVID-19 policy as a pretext to discriminate against him. The Casino's COVID-19 policy states that:

> Employees who are exhibiting symptoms of COVID, have been exposed to someone COVID positive, or have a positive COVID test are required to call out of work on Rivers' Human Resource-managed COVID hotline . . . Employees are required to quarantine for 10 days . . . from the day they become symptomatic.

ECF No. 21, Ex. AA at 2. On May 18, 2022, McCray emailed James Moore, the Poker Room Manager, ECF No. 21 ¶ 6, and said that he was "severely sick" and would "get a covid test," *id.*, Ex. K. Two minutes later, Moore emailed back and told McCray to reach out to the company, per the policy. *Id.* Moore followed up again the next day, and McCray indicated that he still had not called the hotline. *Id.* A day later,, Moore followed up a third time, telling McCray that "HR has not yet received your hotline call" and "you are not eligible to work until you reach out to someone via the hotline and they address your situation." *Id.* In support of the claim that this treatment evinced an inference of discrimination, McCray points to his interrogatory responses, which state that he was "prevented from working while his Caucasian peers were permitted to continue to work." ECF No. 25, Ex. B at 20-21.

McCray was ultimately terminated after a final incident on June 11, 2022. ECF No. 25-2 at 15. McCray had been in a car accident that morning and was slated to work from 7:00 p.m. to 3:00 a.m. McCray Dep. 149:3-25; 183:15-185:5. During his shift, at 7:54 p.m., McCray emailed Moore complaining that he had to supervise that night, even though he had been told he would not, and stating that "I'm always stood up on high volume nights," meaning that he would

frequently be tasked with supervising instead of dealing.[2] ECF No. 21, Ex. M. McCray testified that he asked his supervisor if he could leave early. His supervisor responded that McCray would receive a full attendance point if he left immediately, and half a point if he left at 11:00 p.m.[3] McCray Dep. at 193:12-20. McCray then left at 11:00 p.m. *Id.* Subsequently, the Casino conducted an investigation in which two employees who were working that night stated that McCray appeared uninterested in working and was not responding to high hand calls. ECF No. 21, Ex. FF. McCray testified that responding to high hand calls was one of his responsibilities as a supervisor (although not solely his responsibility), and that he responded to two out of seventeen high hand calls that night. McCray Dep. at 182:19-184:7.

In addition to his email to Moore on June 11, 2022, McCray made several complaints to HR throughout his time at the Casino. In December 2021, McCray made a verbal complaint to Kaitlin O'Connor in HR that his supervisors Alex Gomez and Joe Melchiorre were limiting his compensation by restricting his working conditions in various ways. ECF No. 21 ¶ 18; *id.*, Ex. H. The complaint does not contain any mention of racial discrimination. *See id.*, Ex. H. On March 11, 2022, McCray sent another complaint to HR, complaining that his supervisors would not refill his chips and detailing other ways in which he believed they were preventing him from earning money. *Id.*, Ex. J. In that complaint, McCray stated that his supervisors "have a biased opinion on who should make money and who shouldn't and it should be [i]nvestigated." *Id.* On June 10, 2022, McCray emailed Jim Moore with another complaint, this time that his supervisors Gomez and Ricci were putting him in lower-value tournaments instead of higher-value tournaments or regular tables. *Id.*, Ex. L. McCray wrote in that complaint that he "should have the same right to be treated

[2] An employee in a supervisor role makes a higher base rate of pay, whereas an employee in a dealer role makes a lower base rate, but is supplemented via tips, which are variable. ECF No. 21, Ex. E at 15:7-16:12.
[3] An employee could be disciplined for receiving a certain number of points. ECF No. 18 ¶ 50.

equal," and asked Moore to "[p]lease make it fair and equal." *Id.* On June 11, 2022, McCray wrote an email to Moore complaining that he had been told he would deal, but was switched to supervisor, and that he was "always stood up on high volume nights." ECF No. 21, Ex. M. The complaint contains no mention of racial discrimination. *Id.*

McCray received several notices of disciplinary infractions while at the Casino. On December 14, 2021, he was issued an attendance notification form indicating that he was late on December 4, 2021, and had called out on December 12, 2021. *Id.*, Ex. S. McCray did not recall reviewing this form or missing attendance on those days. McCray Dep. at 161:17-162:8. On December 17, 2021, McCray received a performance improvement notice ("PIN"), stating that he had been told to speak to his shift manager before leaving early but did not do so. ECF No. 21, Ex. T. McCray did not recall this incident. McCray Dep. at 163:2-16. On February 27, 2022, McCray received a PIN for cutting in front of guests to refill his chips. ECF No. 21, Ex. U. McCray testified that he disagreed with that characterization of his actions, and that he refilled his own chips because his supervisors failed to do so for him, but he did not cut any guests in line. McCray Dep. at 164:25-168:6. On March 16, 2022, McCray received a PIN for failing to follow his supervisor's reasonable request. ECF No. 21, Ex. X. A box was checked on this form, marked "Written Warning Level 1 (Minor Policy offenses)." *Id.* McCray did not recall receiving this notice. McCray Dep. at 169:19-170:3. On March 31, 2022, McCray received a PIN for walking away from a table while chips were out. ECF No. 21, Ex. Y. A box on the form was checked, marked "Final Written Warning Notice." *Id.* McCray recalled the incident, although he maintained that he had merely turned around while chips were on the table, and had not walked away. McCray Dep. at 171:3-173:21. On June 9, 2022, McCray received an attendance notification form indicating several days on which he was late or had called out, and the words "refused to sign" were written on the line for

McCray's signature. ECF No. 21, Ex. BB. McCray claims that this is a fake document and the handwriting is not his. McCray Dep. at 177:3-23. On June 21, 2022, McCray received a PIN stating that on June 11, 2022, he "proceeded not to cooperate" when "directed to perform his supervisor role," that he "displayed negative body language and . . . did not respond to nearly all high hand calls." ECF No. 21, Ex. EE. The PIN also stated that "[a]s [McCray] is already on a Final Written Warning, this coaching will result in termination." *Id.*

McCray was terminated on June 21, 2022. ECF No. 25-2 at 13. On July 4, 2022, McCray emailed Melissa Garwood in HR, stating that he "was a victim of harassment and bias," had "proof of discrimination and racism," and requested to be re-instated. ECF No. 21, Ex. N at 2. That request was denied. *Id.*

McCray filed his original Complaint on May 23, 2023 (ECF No. 1), and an Amended Complaint on January 23, 2024 (ECF No. 18), bringing three counts of discrimination and retaliation under Title VII (Count I), the Civil Rights Act of 1866 (Count II), and the PHRA (Count III) .

## III. STANDARD OF REVIEW

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Indeed, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see also* Fed. R. Civ. P. 56(c).

The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. The non-movant opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

When determining the existence of a genuine issue of material fact, a court must "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d

Cir. 2007). The court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

## IV. DISCUSSION

### a. Race Discrimination

To establish a prima facie claim of race discrimination, Plaintiff bears the burden of proving that: "(1) he is a member of a protected class, (2) he was qualified for the position he sought to attain or retain, (3) he suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of discrimination." *See Vaughan v. Boeing Co.*, 733 F. App'x 617, 622 (3d Cir. 2018). The Casino only contests the fourth element in this case. To meet the fourth element, a plaintiff must either: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action."[4] *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014).

When determining whether employees are similarly situated for purposes of establishing a prima facie case, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Mathews v. Hermann,* No. 07-

[4] The analysis of employment discrimination under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000(e)) and the Civil Rights Act of 1866 (42 U.S.C. §1981) is identical. *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009).

cv-01318, 2008 WL 1914781, at *9 (E.D. Pa. Apr. 30, 2008). The relevant factors are case-specific, but "often include[] a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223-24 (3d Cir. 2009) (internal citation omitted); *see also Chernobai v. Hydraulax Prods., Inc.*, No. 14-cv-06938, 2015 WL 710464, at *4 (E.D. Pa. Feb. 19, 2015) ("Chernobai also alleges that he was terminated for using his allotted sick time, while other non-Ukrainian and/or non-Slavic employees were not. However, Chernobai does not describe the sick time policies nor does he allege that he was subject to the same policy as the unidentified employees . . . . Moreover, he includes no facts showing the absence of factors explaining the different treatment. Chernobai, again, does not allege that he was 'similar in all relevant respects' to employees who were treated more favorably.").

A plaintiff is also required to provide a degree of specificity when identifying comparators. It is insufficient to generally refer to a comparator with a just a first name and no other identifying information. *See Summers v. Children's Hosp. of Phila.*, No. 21-cv-3479, 2022 WL 4120283, at *7 (E.D. Pa. Sept. 9, 2022) (finding comparator evidence insufficient where Plaintiff only knew one employee's first name with no identifying info); *see also Caple v. Daiichi Sankyo U.S. Pharma, Inc.*, No. 10-cv-1271, 2011 WL 6412073, at *9 n.14 (E.D. Pa. Dec. 20, 2011) (same). Similarly, a group of purported comparators may not be identified generically just by their race. *See Mojica v. Advance Auto Parts, Inc.*, No. 15-cv-1418, 2016 WL 107844, at *5 (E.D. Pa. Jan. 11, 2016) (granting summary judgment where "[t]he only comparators Plaintiff purports to identify with respect to any of these situation[s] are unidentified 'white guys'. . . . Plaintiff speaks entirely in general, without any kind of particularity or even numbers of employees, and certainly no

names."). A plaintiff must rely on factual evidence, rather than just "his own beliefs and testimony as to his own beliefs." *Williams-McCoy v. Starz Encore Grp.*, No. 02-cv-5125, 2004 WL 356198, at *7 (E.D. Pa. Feb. 5, 2004).

McCray has failed to provide any relevant comparators or circumstantial evidence to give rise to an inference of race discrimination. McCray's response brief alleges generally that "he was treated less favorably than similarly situated employees outside of his protected class" and that his supervisors "went out of their way to treat Mr. McCray differently than his Caucasian peers." ECF No. 25-2 at 3. Yet a rigorous analysis of the record demonstrates that McCray cannot identify any of his purported comparators in any situation he complained of, nor can he provide sufficient detail to demonstrate that his comparators were similarly situated to him. In addition, he puts forth no other circumstantial evidence of racial discrimination.

McCray's overarching allegation is that the Casino discriminated against him on the basis of race by giving him fewer tables to deal and limiting his earnings, putting him on breaks unduly, and assigning him fewer and lower-value tournaments. The record shows that McCray's allegations remain just that – allegations – based on his impressions and unsupported by evidence. In his entire briefing and deposition, he only vaguely references any potential comparators and offers no specific comparators who were treated better. When claiming that some employees received more tables than he did, he mentions "two women" whose names and races he "[did not] recall," McCray Dep. at 90:12-93:18, and states that other unnamed dealers of "all different races" were able to deal seven or eight games while [he] was only able to deal three, *id.* at 94:5-95:8. McCray similarly alleges that "the same faces" were frequently dealing higher value tournaments, while he was stuck with lower value tournaments, although he could not recall the name or the

race of any of those individuals. *Id.* at 136:6-137:4. A few times, McCray generically states that his "Caucasian peers" were permitted to earn money while he was not. ECF No. 25-2 at 4-5.

McCray's generic claims directly mirror the plaintiff's unsuccessful claim in *Mojica*. There, the court granted summary judgment where "the only comparators Plaintiff purports to identify with respect to any of these situation[s] are unidentified 'white guys.'" *Mojica*, 2016 WL 107844, at *5. As the court explained, "there is absolutely no information on the record from which a jury could determine if these other employees were similarly situated in *any* respect, let alone all relevant respects," despite the fact that "this matter is now at the summary judgment stage, and Plaintiff has had ample opportunity to conduct discovery and make a record." *Id.* Indeed, McCray states multiple times that he explicitly did *not* compare himself to other employees, or even inquire as to whether they were similarly situated. *See* McCray Dep. at 100:3-6 (McCray did not "ever look to compare [him]self to any of the white poker dealers, to see how many tables they were getting"); 114:25-115:3 (McCray did not ask any other employees if his supervisor made any inappropriate comments to them).

This type of generic identification of comparators is clearly insufficient. McCray has not provided a single named comparator, nor has he even stated that any particular employee of a different race was treated better. *Walden v. St. Gobain Corp.*, 323 F. Supp. 2d 637, 643 (E.D. Pa. 2004) ("Although [plaintiff] alleges disparate treatment, he fails to identify any similarly situated individuals or relate the circumstances of any other employees' treatment. This is a major and ultimately fatal deficiency in [plaintiff]'s case."). His general reference to "Caucasian peers" is insufficient as a matter of law. *See Mojica*, 2016 WL 107844, at *5. Determining whether employees were similarly situated requires a level of knowledge about a range of factors which might include their role, seniority, supervisors, or discipline history. *See Opsatnik*, 335 F. App'x

at 223. Accordingly, no reasonable factfinder could determine whether those employees were similarly situated to McCray in the first instance, and whether he in fact received worse treatment than they did.[5]

**b. Hostile Work Environment**

The Casino also moves to grant summary judgment on McCray's hostile work environment claim. A successful claim must show that plaintiff "(1) suffered intentional discrimination because of his/her race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior liability." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017). As in a race discrimination claim, the first factor requires plaintiff to identify comparators. *See Williams v. Aramark Campus LLC*, No. 18-cv-5374, 2020 WL 1182564, at *6 (E.D. Pa. Mar. 12, 2020). For a work environment to be sufficiently severe or pervasive, the Court considers the totality of the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's psychological well-being." *Lamb v. Montgomery Twp.*, No. 15-cv-6759, 2016 WL 7426125, at *9 (E.D. Pa. Dec. 23, 2016) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

The only comments McCray cites in support of his hostile work environment claim are a statement from his supervisor that McCray "shouldn't be walking around here like [he] owns the place, ECF No. 21¶ 30, and remarks by supervisors about his tip jar being full. McCray Dep. at 111:19-114:8. "Mere offensive utterances are insufficient to create a hostile environment, even if

[5] A dispute of fact exists as to the precise circumstances of McCray's termination; namely, McCray maintains that he was performing his duties as supervisor while the Casino claims he was not. However, this dispute is not material since even viewing the evidence in the light most favorable to McCray does not identify a comparator or otherwise convey any reason to believe the termination was racially discriminatory.

they engender offensive feelings in an employee." *Dykes v. Marco Grp., Inc.*, 222 F. Supp. 3d 418, 430 (E.D. Pa. 2016) (quoting *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014)). "The purview of Title VII does not extend to all workplace difficulties, even where the conduct at issue may be crass and unwarranted." *Lamb*, 2016 WL 7426125, at *9.

For the reasons discussed above, no reasonable jury could find that McCray suffered intentional discrimination. He provided no comparators who were ostensibly treated better, and he did not provide evidence of any other action tinged by racial discrimination. Nor was the conduct described by McCray "severe or pervasive"; a handful of stray, non-discriminatory comments combined with the other non-discriminatory conduct described by McCray cannot meet the legal standard.

**c. Retaliation**

To establish a prima facie case of retaliation, a plaintiff must show that: "(1) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action."[6] *Bonson v. Hanover Foods Corp.*, 451 F. Supp. 3d 345, 353 (M.D. Pa. 2020). "A causal connection can be demonstrated by providing direct or circumstantial evidence of (1) unusually suggestive temporal proximity; (2) a pattern of antagonism following the protected activity; or (3) a showing that the reason for his alleged adverse action is pretextual." *Biggs v. Thomas Jefferson Univ. Hosp.*, No. 13-cv-03037, 2014 WL 3709749, at *4 (E.D. Pa. July 28, 2014). "If the employee establishes a prima facie case for retaliation, the burden then shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." *Id*. (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)).

[6] A PHRA retaliation claim is analyzed similarly to a retaliation claim under Title VII. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015).

"Opposing unlawful discrimination" by filing an informal complaint qualifies as a protected activity. *Veal v. Am. Hearing Aid Assocs., Inc.*, No. 17-cv-1738, 2018 WL 3632159, at *4 (E.D. Pa. July 30, 2018) (citing *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006)). However, the complaint is not protected if "no reasonable person could have believed that the underlying incident[s] complained about constituted unlawful discrimination." *Id.* (quoting *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008)).

McCray asserts that his protected activity was the complaints he made about differential treatment he received due to his race. ECF No. 25-2 at 10. His claimed adverse employment action is his termination. *Id.* at 12. He alleges that his termination just eleven days after his final complaint creates an "unusually suggestive temporal proximity between the protected activity and the adverse employment action." *Id.* at 13. The Casino argues that McCray "complained about general unfairness, but did not raise issues regarding his race until after the Casino terminated his employment." ECF No. 22-2 at 18. The Casino also asserts that there was no causal connection between McCray's complaints and his termination. *Id.* at 19.

Both of McCray's allegations fall short. First, none of his complaints prior to his termination specifically allege racial discrimination. McCray does make general comments about wanting "equal treatment," but his complaints bear no indication that he was being treated inequitably because of his race. *See Mazur v. Sw. Veterans Ctr.*, No. 17-cv-826, 2019 WL 4345726, at *37 (W.D. Pa. Sept. 12, 2019) ("there is no evidence of record upon which a reasonable jury could find that . . . [plaintiff] expressed to anyone at [defendant] that she [suffered adverse employment actions] because of her race."). As discussed in more detail above, the incidents discussed in McCray's response brief do not contain an inference of discrimination, and neither do his complaints to HR while he was employed at the Casino. Even if McCray "believed

in good faith that he was treated unprofessionally . . . , the law requires that his complaint[s] be premised on [] incident[s] reasonably thought to be unlawful discrimination. Merely discourteous behavior does not rise to this level." *Veal*, 2018 WL 3632159, at *5.

Second, the temporal proximity between McCray's complaints (which do not include any reference to racial discrimination) and his termination is not unusually suggestive, and is thus insufficient to create a causal link. The record evidence shows that McCray made a series of complaints within the organization, on December 7, 2021, ECF No. 21, Ex. H, March 11, 2022, *id.*, Ex. J, June 10, 2022, *id.,* Ex. L, and June 11, 2022, *id.*, Ex. M. He was ultimately terminated on June 21, 2022, eleven days after he made his final complaint. ECF No. 25-2 at 13. Although McCray's termination was close in time to his most recent complaints, McCray's position ignores that he made his other complaints several months before his termination. Therefore, the temporal proximity is not overly suggestive. *See Collins v. Kimberly-Clark Pa., LLC*, 247 F. Supp. 3d 571, 599 (E.D. Pa. 2017) (finding that internal complaints occurring three months, four months, and five months prior to an adverse action is insufficient). Moreover, an eleven-day gap is not unusually suggestive where that time was used to conduct an investigation. *Motto v. Wal-Mart Stores East, LP*, 563 F. App'x 160, 163 (3d Cir. 2014). Here too, in the time between McCray's June 2022 complaints and termination, the Casino conducted an investigation, collecting statements from eyewitnesses and compiling relevant data. *See* ECF No. 21, Exs. DD, FF. Temporal proximity is meant to be used as evidence of a causal link, and McCray has proffered no reason why the Casino would terminate him because of his June 2022 complaints, but not his earlier complaints. *See Selvato v. SEPTA*, 143 F. Supp. 3d 257, 270 (E.D. Pa. 2015) ("[I]t is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case.") (citation omitted).

## V. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 22) is **GRANTED**, and the case is **DISMISSED**. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**